Case number 2017-3520, Pension Benefit Guaranty Corporation v. Findlay Industries Inc. and Ohio Corporation et al. We're going to have to exceed 15 minutes per side. Mr. Boone, for the appellant. Good morning, Your Honors. My name is Merrill Boone, and I represent the appellant, Pension Benefit Guaranty Corporation, also known as PBGC. I have asked the Deputy Clerk to reserve three minutes of my time for rebuttal. Did that mean I was shocked by your request? I just dropped the pen accidentally. Thanks for that clarification, Your Honor. This appeal concerns two legal issues very important to PBGC and the Pension Plan Termination Insurance Program that PBGC administers. First, whether leasing property between commonly controlled organizations is categorically a trade or business for ERISA liability. And second, whether common law successor liability should be applied to single employer pension plans. This case began when Findlay Industries ceased operations with an underfunded pension plan. PBGC took responsibility for the plan and later filed suit against Findlay Industries and related parties to collect the underfunding. The appellees moved to dismiss regarding the aforementioned issues, the issues on appeal. The district court granted those motions, and PBGC petitioned for and was granted an interlocutory appeal. As to the trade or business, the whole purpose of applying the control group rules to ERISA liability is to prevent businesses from shielding their assets from that liability by fractionalizing their operations among multiple commonly controlled organizations. Is this really, though, just a question about whether or not the tax code construction is the appropriate one for ERISA? Well, that is certainly a very big part of the issue. And there was an opinion, the United States v. Gretzinger, which concerned some provisions of the tax code which have nothing to do with ERISA. And it actually had to do with whether gambling losses of an individual were deductible as trade or business losses. And that's not the best rule to be applied here. The categorical rule is the best rule to be applied here, and it has been applied by every other court looking at this issue. Many pension plan sponsors use property that's owned directly or indirectly by the sponsor's owners, and that property is really a business asset and should not be shielded from business liability. And preventing this kind of evasion through fractionalization is accomplished by holding that leasing between commonly controlled organizations is categorically a trade or business, period. So it is not relevant whether the liability arose from a multi-employer plan or a single-employer plan. It is not relevant whether the leasing at issue would be considered active or passive. It is not relevant whether the lessor is a trust, a sole proprietorship, or some other kind of organization. And it is not relevant whether the plaintiff can prove that the organization- So what is it that we ought to look at? I mean, just zeroing in on that, you told us what's not relevant. What is the relevant factor or factors that we should consider or that the court should consider in making that determination? There's only three facts. And in this case, those three facts are present. The three facts are the ownership of the lessor, the ownership of the lessee, and the existence of leasing. And if the ownership is above 80 percent, those organizations will be under common control. And in this case, they were under common control as of the date of plan termination, which is the key date. And they were also leasing-the trust was leasing to Finley Industries. So all three facts are present in this case. And the appellants have tried to distinguish this case based in part on the fact that the trust was set up by the grantor to take care of his sisters, but he's ignoring that at all times the residual beneficiaries of this trust have been the grantor's adult sons, Philip Gardner. What if the residual beneficiaries had not been the sons that were involved in the business? Let's just say the residuary had been a charity, nothing to do with the business. Then we wouldn't be here on that issue, at least, because there would be no common control. Because the sons-and there probably wasn't common control at the inception of the trust either, because the sisters, who were the immediate beneficiaries, were younger and all still alive. But by the time the plan terminated, only one of them was even alive, and she was 86 years old. So the ownership of the adult sons had increased above 80%. And meanwhile, they also inherited the ownership of Finley Industries from their father. So you look to the question of control at the time of termination of the plan, or when? Yes, exactly, at the plan's termination date, which was 2009. So I'm still confused then about my hypothetical. Let's assume that the real estate was still being held in trust at the time of the termination of the plan. Trust hadn't terminated. It hadn't distributed its assets, in this case the land, to the beneficiaries. But the ultimate beneficiary sometime down the road was going to be, in my example, a charity. Well, yet there's no common control, and we would have no claim against the trust. Why wouldn't there have been common control in my hypothetical if the sons were the trustees, they're just not the residual beneficiaries? Well, because they're controlling the lease. Because it's beneficial ownership rather than legal ownership, which is determinative. And if the sons had no beneficial ownership, then they... Do we find that in the cases, this fine line that you're drawing under the so-called categorical rule? Well, no, not many of them, or perhaps not any of them, because... Because none of them have these facts. That's correct, Your Honor. Basically, you want us to make this up. No, Your Honor. I would say that it's a fact pattern that just hasn't happened yet, but it's easily ascertained from the previous rules. So that's exactly the point. Why a categorical rule as opposed to a rule that looks at the facts? Well, this rule does look at three facts. It looks at ownership of the one entity and ownership of the other entity, and finally, whether there's an economic relationship. Generally, it's leasing. And in this case, in your hypothetical, the fact that's missing is the ownership of the lessor. The ownership of the lessor does not... It's zero. The adult son's ownership of the lessor would be zero under that hypothetical because their ownership is only legal, not beneficial. And that's measured at the time the trust terminates. Is that correct? No, Your Honor. It's not when the trust terminates, but when the pension plan terminates. When the pension plan terminates. Okay. So under this categorical rule, you look to, you said, the beneficial ownership at termination, not the legal ownership at termination. That's correct. Even though the legal termination would place the trust under common control, if the trustees that run the trust and set the lease payments and everything else are the sons and they run the business, if the beneficiary, in my example, was somebody else, then that wouldn't be a trader business. Correct. Even though it clearly was under common control at the time of termination of the trust. Well, the word control here is perhaps misleading, but that's the word that was used in the control group regs. But it's really about ownership, not control. And this is found in the control group regs, that's Treasury Regulation 1.414C-2, provides that the ownership of a trust is measured by the party's actuarial interests. In other words, their beneficial interests. So it's not like we're making this up. And the reason it hasn't happened much is because of the 27 cases we cited, only three of them involved trusts, and there was no dispute about the ownership of the trust in those cases. I guess what I'm still troubled by is this idea that we should endorse a categorical rule that doesn't look at all the facts. I will acknowledge that at least the way you're answering the question, there are three facts that you look at under the test that you like, but you ignore any other facts, regardless of how relevant they might end up being. Is that a fair statement? We would say they aren't relevant under the rules that all the other courts have followed, and there's a good reason for that. The purpose of the control group rules is to prevent the fractionalization, the avoidance of pension liabilities, or the segregating of assets to make them unavailable to satisfy those pension liabilities, by setting them off in a different entity under the ownership of a different organization. And so this rule gets at that problem better than any other rule would. From whose perspective? Well, from the perspective of you, certainly, but also from Congress's, because Congress intended that Congress must have had a reason for applying the control group rules to ERISA, and courts have found that that reason is to prevent this kind of fractionalization, and that's been cited in numerous cases, many of which were cited in our brief. So that's a perfect segue into your request to ask us to create federal common law, where Congress specifically addressed the question, or considered the question, of whether to have successor liability in these single examples here, in these single employer examples, and in the compromise they reached, as I understand it from the legislative history, they declined to do so. So you now want us to do what Congress expressly considered and declined to do under the guise of creating common law. Well, I don't agree that we can infer that, Your Honor. One house had that clause in it, and the other house did not, and the final bill ended up without it, and I can't infer that from that? No, Your Honor, and I think we've cited a Supreme Court precedent to that effect, that you can't infer from mute legislative maneuvering. Even if we could, I mean, you're saying that we can't infer that. So even if we couldn't infer that, wouldn't the application of federal common law successor liability here contribute to a chilling effect on the market purchase and reorganization of companies that might otherwise be failing companies? Well, I would just cite to you. Wouldn't that argue basically for the point that Judge McKeague made? I would just like to cite one of the courts that has held otherwise as to withdrawal liability, which is indistinguishable for any practical matter. Several courts, including two at the circuit level, have held that the federal successor doctrine does apply to withdrawal liability, and one of those courts was Sarif, was the Seventh Circuit, and Sarif v. Manweb, and they noted that it's equitable to apply this federal successor doctrine because the asset purchaser is not liable unless, among other things, it has notice, it had notice of the withdrawal liability before the sale so that it was able to negotiate a change in the purchase price based on that information. Are there other questions, Judge Daughtry? Oh. Yeah, I had one question. I was a little surprised, and you can explain this possibly better than anyone, that the PBGC, and by the way, there's a dog in the American Kennel Club that has almost the same initials. I've forgotten what the full name is, but that the PBGC didn't argue that this was a reorganization. Well, we think that the provision 1369B, which provides for corporate reorganizations, that's the title, is not designed for asset sales, clearly. I think we can agree on that. It's designed for structural reorganizations such as mergers, and therefore it does not have anything to do with successor liability. Okay. Because this was simply a sale of assets. Right, Your Honor. Judge McKee, anything further from you? Then, Counselor, your time is up. You may use your rebuttal time at the appropriate time, sir. Thank you, Your Honor. Thank you, Mr. Boone. Good morning. May it please the Court, Your Honors. My name is Caroline Gentry, and I represent the defendants' appellees in this case. I'd like to begin with the second claim that Your Honors were just discussing, which is the successor liability claim and the request to create new federal common law. As the Court well knows, it is unusual to create federal common law in the context of ERISA, which is a comprehensive, reticulated statute. And this Court has repeatedly said that there are only three times when you'll do it. And the first time is if the statute, if ERISA, is silent on the issue. And Judge McKee, as you noted, this statute is not silent on the issue of successor liability. Section 1369B does lay out under what circumstances certain successors will be liable. And as Mr. Boone conceded, it omits asset purchasers, which is the situation here. So this is not a case where ERISA is silent. For the same reason there's no gap in the statute to be filled, Congress considered having any successor in interest be held liable, and it did not include that language. It deliberately omitted it. And because Congress left it out, it cannot be said that now, 40 years later, adding asset purchasers to the list of who can be liable is essential to promoting fundamental ERISA. But there are at least two circuit courts that have found otherwise. Is that true, the Seventh and the Ninth? With respect to successor liability? Yes. Not in the context of single-employer pension plans. Well, I thought everybody was willing to admit that there's no real distinction between those two situations. Actually, Your Honor, we believe that there are a number of distinctions. But most importantly, the withdrawal liability provisions from the Multi-Employer Pension Plan Amendments Act do not account for successor liability. They don't have a similar provision of 1369B. They don't say that these types of successors will be liable. So there is a gap in that statute, which we have said makes sense to fill with common law. But the single-employer pension plan does not have such a gap. So we believe that that is an important distinction. I think the presence or absence of a gap is something that we probably don't need to get into because my concern is with the third prong. That is, whether creating a little common law here is essential to the purposes of ERISA. I mean, ERISA has a two-faced goal. One is to protect employees, and the other is to hold employers to their bargain, to their promises of providing pension. Wouldn't you say that was correct? Yes, I would agree that those are some of the purposes of ERISA. Well, it's overarching probably the main purposes, I would think. So let me try this set of facts out on you. Michael Gardner purchased all of Findley's valuable assets for only $3.4 million and within four and a half years had turned a nearly $12 million profit using Findley assets, employing former Findley employees, making former Findley products, and selling to Findley's biggest customer. If we can't say that there's successor liability in that factual situation, what's to stop people all across the country from doing what Findley did and leaving $18 million to $30 million in debt on the corporation? Your Honor, I certainly understand that argument on the equities, and I have several responses to it. But wait a minute. I thought successor liability was an equitable rule. Well, Your Honor, I think it is partly an equitable rule, but in terms of the fact pattern that you presented, I think there are a number of important facts and other principles that come into play. One is that the existing law at the time, state law, which is also the traditional successor doctrine, state corporate law, provides that asset purchasers are not liable for those types of liabilities. There's also a general principle that Congress was looking for uniform law across the country, and if we start letting state law control, then there's going to be no uniformity because state law in this situation is not, in fact, uniform. Why wouldn't we want a uniform applicable rule? I would argue, Your Honor, that we do have a uniform rule. 1369B reflects the state standard corporate law, which is fairly standard across the country in terms of the mere continuation rule, and that is consistent with 1369B. So when Congress was deciding whether to have broad successor liability or limited successor liability that does not include asset purchasers, that is essentially a choice between the federal successor doctrine and the traditional. Okay, but let's go back to the main purpose of ERISA. It's to protect the employees who are left unprotected in this situation and to hold the employers to their promises, which isn't occurring here, and if you can fly in the face of the purposes of ERISA in this manner, it seems to me that everybody will be concocting something like this in order to avoid paying out pensions. What if, for example, in this situation they transferred all the assets to Michael and he sold them to a straw man who then sold them back? That would keep them from ever getting to the pension promises, wouldn't it? I mean, you could think up situations that would cause you to be able to avoid liability just through this kind of inventive situation. I'm not saying that that was the case here, but if we don't have a successor liability principle at play here, that's what's going to happen. Your Honor, I do understand your concern and I really do want to try to address it. There is a countervailing principle which is discussed in the artistic carton case from the Seventh Circuit, which is an ERISA case, and they describe a situation where an employer is going bankrupt, essentially. The problem with imposing liability on all asset purchasers is that you discourage asset purchases. You discourage the sale of failing businesses, and that is a double whammy for the employees that you're rightly concerned about because then not only do they lose their pensions, but they lose their jobs. Discouraging the purchases of failing businesses, which is what would happen if you had a broad rule of successor liability like that, puts everybody out of work. It doesn't help anybody. In this situation, for example, what Michael Gardner did is he took businesses that were undisputedly failing and he turned them around and those people had jobs. When you look at the equities of the situation, it's easy to say in hindsight that, well, he made $3 million a year, $12 million over four years, and he only paid $3 million. But at the time of the sale, it was the beginning of the Great Recession. There was a great deal of uncertainty about what the future of the markets were, what the future of the automobile market was, which is what he was in. So it was still a risk. And in terms of, well, he adjusted the purchase price and this is all a sweetheart deal. Well, you can't convince me that it was an arm's length deal. Your Honor, there is certainly a father-son relationship. Now, the father was dead at that point. It was his father's company. But in terms of an arm's length relationship, anybody else could have bought that company. Another company had come along and looked at it, but nobody else was willing to buy it. So I would submit that the facts about that are not before the court at this time because we're on an interlocutory appeal and a motion to dismiss. But I would not agree with that characterization. However, the more important point is that if you look at the pleadings, what PBGC has pled is that, well, he made $12 million over four years. But they also say that at the time of the sale, he knew. They say that Michael Gardner knew that there was liability of $18 million. Well, who would buy a company, even if they thought they were going to get $3 million a year, if they knew that there were $18 million in liability? They wouldn't. He would have walked away. Nobody would buy that company and the employees would be out of jobs. Well, speaking of equity, am I correct in assuming that PBGC is seeking the full $18 million from Gardner? Yes, Your Honor. They're actually seeking $30 million from Gardner because of joint and several liability. They're seeking all of the liability that Findlay Industries has from the companies, from the two companies. These were two of, I believe, 16 plants that Michael Gardner bought. You pay $3 million for the assets and then you owe $30 million on the pensions. Correct. We think that's fair because he made some money in the meantime. I agree, Your Honor. Not only is it not fair, but it will have a chilling effect. And that's something Congress considered at the time that they passed ERISA, and it's something that other courts like the Artistic Carton Court has considered. But that Artistic Carton opinion, wasn't that an earlier opinion that followed the Seventh Circuit, more recent Seventh Circuit opinion? Your Honor, it's a 1992 opinion. Yes, and I think the later one in which they applied successor liability in the multiple employer thing was a later case, was it not? Yes, Your Honor. I would also note that, however, I noted there are distinctions between multi-employer plans and single-employer plans. There are a number of distinctions. One of them is that withdrawal liability is different from the kind of liability we're talking about here, where PBGC essentially has to guarantee the benefits, and they have the right to come and sue people who essentially owe under the rules that Congress has set out. In withdrawal liability, the PBGC is not who brings the suit. It's the union who brings the suit or the party that's essentially being hurt. And there are very different rules set up for when an employer can withdraw and how they withdraw to protect themselves from liability. It's simply a different scheme. So to say that because there's this kind of rule over there, it should therefore come to this situation, it doesn't make sense. It's really apples and oranges. Is there a particular case that you believe more strongly supports your position, or that strongly supports your position in this interest? And also, how does this trade or business definition impact where we should come out on this in terms of characterizing Michael Gardner's actions and the consequent results? Excellent questions, Your Honor. On the first question, just to finish up Count 15 with successor liability, I think one of the best cases is Peters v. Western Paper Products. It's a Sixth Circuit case from 1998. And the point there is the principle that if you have too broad a rule of successor liability, you're going to hurt everybody, essentially. That's what I would point to. Turning to the trade or business issue, I think this issue really relates to the father, to Philip Gardner, and he set up this trust to take care of his sisters. You had asked initially at the beginning of the argument what the relevant facts were. And if you look at the cases, 27 or so cases cited by PBTC, there's an additional fact that Mr. Boone did not mention in his argument, and that is that those cases involve leasebacks. So a leaseback is essentially where the employer owns the entity that is doing the leasing and the entity that is paying the rent. And essentially, it's a closed loop. They're paying themselves. It's essentially a closed loop. The facts here do not involve a leaseback. Here, there's no closed loop. The income went to the sisters. It never could go to Philip Gardner. It could never go to his company. And, in fact, the trust says that he can never be a beneficiary, and it's an irrevocable trust. So the fact that's really salient to the categorical rule that PBGC urges here is missing from our fact pattern, and we would argue that that's an important distinction. One of the things that bothers me about the successor liability question is the concept of settled expectations. There was no federal common law at the time of this transaction. We get into retroactivity when we deal with habeas cases and criminal cases. We don't really talk about it much, at least that I can think of off the top of my head, in connection with civil cases. But have you come across any authority that deals with this one way or the other when there isn't any requirement that he assume those liabilities and an asset sale at the time he does it, and then however many years later now they want to come back and collect not only the $3 million or the $12 million, but they want to collect $30 million? Your Honor, I believe, I don't remember the case, but there are cases cited at the end of our brief when we talk about adopting state law as the common law principle rather than federal law. And that's one of the reasons is because you want to avoid upsetting the commercial expectations of the parties, because that's not fair. I can't think of a case offhand where that happened retroactively and the equities were looked at, but certainly we think that's exactly right. And that's why if the Court decides to adopt a common law rule, we think it should be at the state law doctrine, which is the traditional successor doctrine, because that is consistent with the settled expectations of the parties, and it's also consistent with 1369B. So it's not rewriting ERISA, essentially. That's what we would argue. But as Judge Autry asked you, are there any other provisions in ERISA where they rely on state law, where the state law is presumably different from state to state and then don't achieve uniformity under the context of ERISA? Your Honor, I think maybe statutes of limitations under ERISA. I believe that you adopt state law for statutes of limitations, and those can differ from state to state. But that affects the ability to bring suit. It doesn't affect the result. I mean, if you're beyond the statute, you're out, but it doesn't have any effect on the substance of the situation. That's true, Your Honor. It affects your right to bring suit, not on the substantive law that will govern when you get there. But that's at least one example. I believe there are others. But I know we cite cases around those points at the end of our brief, Your Honor. Other questions? Judge Autry? No, thank you. Thank you for your argument. Thank you. Mr. Boone for rebuttal. Your Honors, I'd like to address a few things regarding successor liability and one thing about the trader business argument. First of all, withdrawal liability is very similar to the PBGC claims at issue, contrary to what Ms. Gentry said. The ultimate purpose of the PBGC claims and the withdrawal liability claims is the same. It's to allow PBGC to continue to guarantee benefits under multi-employer and single-employer pension plans without having to raise premiums on the employers that are still contributing to those plans. And according to 29 U.S.C. Section 1302A, that is one of the three purposes of the subchapter that applies to both single and multi-employer pension plans. Why do we have different sections then for the two different plans, types of plans, if you simply say, oh, well, geez, they look pretty similar to us, we'll just apply the same rules to both whether the statute says that or not? Well, there are different, I'm not saying they're identical. I'm saying that in the important fact, as to the important facts, they are. The facts relating to liability. In the briefs below, both the court and the appellees identified several differences between multi-employer and single-employer plans, but none of them had to do with liability. In liability, they're similar. And not only regarding the purpose of that liability, but also the persons explicitly liable under the statute are almost identical, which suggests that under the common law, the same people should be liable. Do those multiple-employer setups exist only in the situation where there is an agreement under a CBA? Right. Actually, multiple-employer is actually a third category of plan, but multi-employer plans are plans under a collective bargaining agreement, yes, Your Honor. Is that the reason you all don't come in, the union comes in? Well, actually, we are the ultimate guarantor of those benefits as well, but there is an intermediary, which is the plan, the trustees, which actually suggests that we should have more protection, not less, because there is no intermediate barrier guarantor. And the final similarity that I wanted to mention is that the unfunded benefit liabilities are calculated by subtracting assets from benefit liabilities, and that's the same way that withdrawal liabilities are calculated. And also, regarding 1369B, counsel continues to say that that doesn't apply to multi-employer plans, but we've said over and over again in our briefs it does apply to multi-employer plans under 29 U.S.C. 1398. It says that the corporate reorganizations described in 1369B are not considered withdrawals, and the successor or parent corporation is considered the original employer, which means that the successor or parent corporation is liable when a withdrawal eventually does occur, just as the successor or parent corporation is liable for termination. Are you arguing at successor liability that Gardner would be liable for the full amount of the shortfall here because he made money off of this asset purchase, or would your position be exactly the same had he not made a dime? Legally, our position would be the same. If there's notice and substantial continuity, then legally, that's all we need to allege. If he knew that there was a deficiency on the pension plan, then he'd be liable for the full amount of that deficiency if he bought any assets, even if he lost money in the deal. Not any assets. There's got to be substantial continuity. Okay, a substantial amount of the assets. So he takes a flyer, he buys the assets on the cheap, and he doesn't make it. He fails. He's liable for all of the pension amounts, right? Well, it's not just buying the assets. It's hiring the same employees, having the same customers. Okay, he does all the same things. We'll use all the same facts, but he fails. He doesn't make any money. He actually loses money. He's still liable for the full amount of the pension plan, right? He personally was not liable on that basis, or any basis, actually, other than for a small amount of fraudulent transfers aren't at issue here. But the companies are liable, and of course the companies, if they didn't make any money, if they weren't profitable, if they failed, then we wouldn't be going after them anyway. But the point is it's not the fact that this venture turned a profit of $12 million over four years. As I understand your answer, that's basically irrelevant except to explain why you're actually suing them. Well, no, I wouldn't say it's irrelevant because the Seventh Circuit has held, has stated that, and other courts, I don't think any court disagrees, that successor liability is an equitable remedy. And that's, I think, why we mentioned that fact in our complaint, the amount of profit. I want to get clarification on Judge McKeague's previous question, which is, assuming all of the facts that we have in this case now, except that under his hypothetical, Gardner lost money rather than made money, would you still allege that he owed whatever this amount is? And your question was, well, we wouldn't be going after him, but is it that you wouldn't be going after him not because he wasn't liable, but because of the futility of going after him, and which is it? Because I think that's an important point. Well, I think it's important also to note that we wouldn't be going after him personally. We'd be going after the companies. I said all of the same facts. You're not going after him personally now. So Judge McKeague's question said, assume everything we've got now except assume a loss. And he said, would you still argue that, would you still be seeking, I mean, would there still be liability? You said, well, we wouldn't be going after him. And my question is, would you not be going after him because of the futility or because there's no liability? Mainly because of the futility. Okay. So Ms. Gentry's argument is we can't let the agency do this because it will chill efforts to save failing companies. And your response to that is if there are not sufficient assets available, we wouldn't bother to come in and try to ruin the business, is that? Yes, that's correct. And this happens in bankruptcy and receivership situations all the time. But what we're missing here is Gardner takes these assets and he puts them in, if I remember, two different companies, right? So let me change the facts a little bit. And let's assume that these two companies, or however many there are, don't end up making any money in connection with the former assets and customers and employees. But these other companies are successful in other respects. They're either already successful when they take a flyer on these assets or whatever. You're going to go after them. That's correct. Even though they didn't make a dime on these assets that they acquired here because they have assets. That's probably true, Your Honor. Thank you. Thank you, Counselor. You've exhausted your time and we appreciate your argument and we appreciate the submissions and argument of both sides. The matter is submitted. Thank you. Thank you.